Filed 12/29/22  P. v. Charles CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DION PATRICK CHARLES et al.,<br><br>        Defendants and Appellants. | C092841<br><br>(Super. Ct. Nos. 16FE014627,<br>17FE002458) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DION PATRICK CHARLES,<br><br>        Defendant and Appellant. | C093057<br><br>(Super. Ct. Nos. 13F07333,<br>14F02499, 16FE013142) |

As six-year-old I.P. looked out the window of a car driven by her mother, Angelina P., she saw defendant Adreiona Taylor in the car next to them yelling at I.P.'s mother to pull over.  Taylor fired a gun six times and I.P. was shot in both arms.  At trial,

1

the prosecutor established that Taylor was the shooter and her brother, defendant Dion Patrick Charles was the driver. Charles and Taylor were found guilty of attempted murder of Angelina P. and of discharging a firearm at an occupied vehicle. Taylor was also found guilty of attempted murder of I.P. On appeal, both defendants challenge the sufficiency of the evidence supporting their convictions. Charles also challenges the admission and use of hearsay evidence, and the trial court's response to the jury's questions regarding knowledge and intent.[1] Both defendants raise various sentencing issues, including that the trial court erred in imposing upper term sentences due to the amendments to Penal Code section 1170, subdivision (b), made by Senate Bill No. 567 (2021-2022 Reg. Sess.). We agree with defendants in this last regard and shall remand their case for resentencing and otherwise affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2016, Angelina P. and Rene Cassiano were friends until Cassiano passed away in April 2016. Prior to his death, Cassiano dated Taylor and when Angelina spent time with Cassiano, Taylor was frequently present. Angelina and Taylor were friends on social media. Angelina was also familiar with Charles, Taylor's brother, because he lived next door to Angelina's grandmother.

The week before Cassiano died, Angelina gave him sensitive information about Taylor, likely causing Cassiano to end his relationship with Taylor. Taylor was apparently upset that Angelina contributed toward Cassiano's funeral expenses. While Angelina claimed, "there was never no beef" between Taylor and herself, Taylor did not

---

[1] On February 2, 2021, we granted Charles's motion to consolidate case Nos. C092841 and C093057.

2

want Angelina at the funeral and Facebook messages posted by Taylor suggest there was a "beef."[2]

Nearly a month after Cassiano's funeral, Taylor posted the following on Facebook:[3] "It's hella funny reading this shit in Rene's old phones. MF be so fucking fake and two faced," "I gave him everything I could ever give a person. [¶] I took care of him for three years mentally, emotionally, and physically. Can't nobody say shit about that. I could care less what the fuck anyone thinks of me . . . . [¶] So fuck you, fuck you, fuck you again. Oh, and to the bitches I seen in the text messages, y'all are getting it, so be on the lookout 'cause this bitch is gonna -- is goin' mainy[4] and . . . [m]e knows that ain't a pretty sight. So line em up 'cause you bitches are getting knocked down."

*1. The Shooting*

Angelina was a reluctant witness both immediately after the shooting and at trial.[5] When officers interviewed her, some thought she was not forthcoming. Two detectives testified that when they confronted Angelina at the hospital with this perception, Angelina started to cry and expressed concern over being labeled a "snitch." She said Taylor had a big family who would want to retaliate and she was afraid. She admitted

---

[2] For example, on May 14, 2016, the day of Cassiano's funeral, Taylor corresponded with someone over social media complaining that Cassiano's family "did that sneaky shit taking money from that weird bitch Angelina."

[3] On July 27, 2016, law enforcement preserved Taylor's Facebook account, even though it had been deleted that day. Taylor had photographs of Cassiano on her Facebook page and she listed him both as her boyfriend and the love of her life.

[4] "Mainy" is slang for "crazy."

[5] Angelina was held in custody to ensure her presence at trial. After initially taking the stand, the trial court commented out of the presence of the jury, "[i]t's obvious to me, and I believe maybe to the jury . . . that she's not being entirely honest." After Angelina testified, the trial court released her from custody but not from the subpoena; the court admonished her to respond to any calls for additional testimony.

she told her mother about the shooting and that she wanted her mother to report the details to law enforcement officials for her.

The officers recorded their interviews with Angelina, many of which were played to the jury. The following summarizes the evidence introduced in various forms; we specify the manner of introduction when necessary.

Between 7:00 and 7:30 p.m. on July 26, 2016, Angelina and her six-year-old daughter I.P. drove in Angelina's orange Audi, in the Fruitridge area of South Sacramento. I.P. was in the rear passenger side seat and the window next to her was rolled down. As Angelina approached the stoplight at 44th Street and Fruitridge Road, she saw Taylor seated in the front passenger seat of a white four-door sedan, which was traveling on Fruitridge and turning onto 44th. Angelina repeatedly described the car as a dirty, old "scraper" four-door sedan with chipped paint by the grill.[6] Angelina turned right onto Fruitridge, and the white car turned to follow, "driving crazy . . . right behind" her. The white car pulled up alongside Angelina's passenger side, the side where I.P. was sitting. Although Angelina repeatedly said she did not see the driver's face, she described him as a black male, a "big guy," wearing a white T-shirt with wavy hair and a fade haircut. A light-skinned black female passenger, later identified by Angelina as Taylor, leaned over the driver, whose seat was reclined, and repeatedly told Angelina to pull over.

I.P. had her head out her window. She saw and heard a woman in the car next to them scream her mother's name and tell her to get out of the car. To I.P, the woman sounded mad. I.P. described the woman's face as having brown skin, with red dots like

---

[6] Charles was the registered owner of a white Chevrolet Lumina. The vehicle's front passenger side fender was damaged. Charles let other people use this car.

4

pimples, and dark brown hair.[7] I.P. also saw that same woman in the newspaper and on the television.

Angelina told one officer that as she turned onto Lawrence Drive, the white car followed and fired gunshots. I.P. confirmed the shots came from the same car containing the woman who had yelled at her mother. Angelina did not see a gun or a flash from the white car. Although she did not see Taylor pull the trigger, Angelina expressed confidence that Taylor was the shooter. Angelina was sure Taylor was in the vehicle, and that it had to be the female who shot at them. Angelina also stated that her assailants must have been aware that I.P. was in the car because I.P. had been looking out the window just prior to the shooting.

As for the vehicle from which the shots were fired, Angelina described it as an Oldsmobile or Buick. She recognized it as Charles's car. She recognized the car because she had been in the vehicle with Cassiano, who used to drive it. Because of her familiarity with it, Angelina knew the car had bench seating in the front. Angelina used to see the car parked near her grandmother's house in the Oak Park neighborhood.

After shots were fired, I.P. complained of pain and a burning sensation; Angelina pulled over near the intersection of 44th Street and 23rd Avenue. A citizen stopped to help and ultimately drove them to the hospital. Angelina was certain the people in the white car followed her again while she was en route to the hospital.

I.P. suffered gunshot wounds to both arms, and a bullet lodged itself in her left arm. One of the bones in her right arm was shattered. I.P. underwent three surgeries to address her injuries.

---

[7] This testimony was consistent with I.P.'s forensic interview, conducted on January 12, 2017.

## 2. Immediate Investigation

Felicia G., Angelina's mother, learned that I.P. was injured and went to the hospital. When she arrived, Angelina was hysterical. At some point, Angelina told her mother that I.P. was shot when they were driving on Fruitridge Road, and Taylor and her brother Charles were responsible for the shooting. Felicia explained that Angelina and Taylor had had an argument over social media and Felicia thought some of the messages from Taylor were threatening. Angelina did not want to speak with the police herself because she was worried about being a "snitch," so Felicia reported her conversation with Angelina to the police at the hospital that day, including Angelina's identification of Taylor as the shooter. However, the report did not reflect that she mentioned any information about the driver.

Officers gathered evidence from Angelina's orange Audi parked in front of the entrance to the emergency room. The vehicle had bullet holes in the rear driver side window, in the right passenger side door where I.P. sat, and in the metal trim above the doors on the right passenger side, where the bullet lodged itself. One bullet struck just above the passenger side rear door. Another bullet traveled through I.P.'s open window and through the rear driver side window. Another bullet went through the rear passenger door, through the rolled down window, and out the rear driver side door. Law enforcement officers also found six spent .40-caliber shell casings in the eastbound lane of Fruitridge Road.

Officers also gathered surveillance video from a Fox 40 studio near Stockton Boulevard and Lawrence Drive, which recorded Angelina's vehicle traveling eastbound in the number one lane of Fruitridge Road and a white sedan approaching the passenger side of Angelina's vehicle in the number two lane on July 26, 2016, at 7:26 p.m.

## 3. Social Media

Two days after the shooting, two posts appeared on Angelina's Facebook page. The first was addressed to "Adreiona Celestina" or "Celecstina, Taylor", and it said,

6

" '[Y]ou coward ass bitch. Where you at? You running now?! What you scared of, you wankst (phonetic) enough to shoot my daughter, but now you nowhere to be found . . . Can't run for long.' " The second message said, " 'The six-year-old girl, [I.P.], that was shot on July 26th at 7:30 p.m. was shot by Adreiona . . . Celecstina Taylor aka Noney. Is [*sic*] there was also a male driver but doesn't know his name yet.' " In other messages Angelina sent to friends via Facebook messenger two days after the shooting, Angelina identified Taylor as the one who had shot I.P. One of the messages stated, " 'She shot at my car and shot my baby. I seen with my own eyes.' " That same day, Angelina sent Detective Evelyn Madriago a text message explaining that "people [who] were talking" identified Charles as the driver. At some point, Angelina also texted her father to say that Charles was the driver.

Detective James Waters interviewed Angelina over the telephone on August 10, 2016. Angelina identified the driver as "Dion" after she explained that, although she did not see the driver's entire face, she saw his hair and his facial hair. She also recognized the vehicle as Charles's. Upon further reflection and after "putting everything together," she knew it was Charles. On cross-examination, Detective Waters clarified that Angelina did not directly state that Charles was the driver, but she suggested it.

*4. Geolocation Analysis*

An expert testified regarding geolocation evidence obtained through cell phone records, and explained that the records provided an approximation, not an exact location, of the cell phone. Charles's cell phone records revealed that two calls were made from his cell phone at 7:17 and 7:20 p.m. The initial call was made from along Fruitridge Road and Highway 99, in the South Sacramento area. The latter call indicated movement toward Oak Park. At 7:49 p.m., the cell phone had moved such that it was utilizing a cell tower that faces Highway 99 and is slightly south of Highway 50, which is just outside of the coverage area for the intersection of Fruitridge Road and Lawrence Avenue. By 8:00 p.m., the cell phone moved slightly south of Highway 50. At 8:23 p.m. and

7

8:30 p.m., Charles's cell phone was in the Oak Park neighborhood, near the University of California, Davis Medical Center. Afterward, the phone moved north and almost out of Sacramento County. The phone then traveled into the Oroville area in Butte County. After that point, the phone remained in Oroville and did not return to Sacramento until the morning of July 30, 2016, at which time it was next to the sheriff's department station where detectives interviewed Charles.

  5. *Defendants' Arrest and Criminal Charges*

  Law enforcement officers received anonymous tips that Charles and Taylor "had fled" to Oroville. Although they lived in the Oak Park neighborhood of Sacramento, officers learned that Charles and Taylor had family who lived in Oroville.

  Three days after the shooting, officials learned that Charles's Chevrolet Lumina was parked at a family member's home in Oroville. Four days after the shooting, on July 30, 2016, detectives served search warrants at two residences in Oroville in connection to the shooting.

  While searching one residence in Oroville, an officer found a purse containing a large sum of cash and identification and ATM cards in the name of Adreiona Taylor as well as a bag containing men's clothing and paperwork bearing Dion Charles's name.

  Charles's white Lumina was parked at the other residence in Oroville. The right front fender of the car was damaged and missing paint. Officers also found gunshot residue on the headliner above the driver's seat and on the headliner of the passenger's seat of that car.

  Officers found and arrested Charles and Taylor at the first residence; Charles was located inside a parked boat. Officers confiscated the LG flip cell phone that Charles possessed when he was taken into custody.

  The same day Charles was arrested, Detective Kimberly Mojica interviewed him. Detective Mojica estimated Charles to be between 6 feet 5 inches and 6 feet 6 inches tall. Charles initially denied owning a white Chevrolet Lumina. When pressed, Charles

admitted that he owned the vehicle, but he claimed he did not drive it on July 26, 2016, because he was camping in Oroville from July 13 to 27. According to Charles, he last saw the Lumina at his mother's home on July 28, 2016. When asked how the Lumina got to the home in Oroville, Charles said he did not know and claimed it was there when his girlfriend drove him to Oroville on July 29. Throughout the interview, Charles gave inconsistent explanations about his whereabouts on the day of the shooting and ensuing days. Similarly, Charles made conflicting statements about the Lumina. Nonetheless, the last thing Charles said was that he did not drive his Chevrolet Lumina on Fruitridge Road at the time of the shooting.

Detectives Madriago and Mojica also interviewed Taylor. When Detective Madriago showed Taylor photographs of Cassiano and Angelina, she claimed she did not know them. Taylor similarly claimed she was unfamiliar with Charles's Chevrolet Lumina when shown a photograph.

Taylor and Charles were each charged with attempted murder of Angelina (count two) (Pen. Code, §§ 664/187, subd. (a))[8] and discharging a firearm at an occupied vehicle (count three) (§ 246). For each of these charges, the prosecution also alleged Charles personally used a firearm during the commission of the offenses within the meaning of section 12022. In count two, the prosecution alleged Taylor personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b) and (c). In count three, the prosecution alleged Taylor personally and intentionally discharged a firearm causing great bodily injury to I.P., within the meaning of section 12022.53, subdivision (d). The prosecution also charged Taylor with attempted murder of I.P. (count one) (§§ 664/187, subd. (a)) and further alleged that Taylor personally and

---

[8] Undesignated statutory references are to the Penal Code.

intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (d).

The jury found Charles guilty of both counts, and found true the allegation that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(1). The jury found Taylor guilty of all counts and found true all of the firearm allegations.

The trial court sentenced Taylor to an aggregate term of 11 years four months, plus an indeterminate term of 25 years to life.

The trial court sentenced Charles to an aggregate term of 11 years eight months.[9] This appeal followed.[10]

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Charles argues there was insufficient evidence that he was present for the shooting and therefore both of his convictions must be reversed. Taylor does not challenge her convictions for attempted murder of Angelina or for discharge of a firearm at an occupied vehicle. Instead, she argues there was insufficient evidence she knew I.P. was in the car, much less that she had specific intent to kill I.P., and her conviction for attempted murder of I.P. must be reversed. We are not persuaded.

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to

---

[9] The trial court also sentenced Charles in Sacramento County Superior Court case No. 16FE013142 to a two-year prison term on a conviction for unlawful possession of methamphetamine for sale (Health & Saf. Code, § 11378) to run concurrently with the sentence in Sacramento County Superior Court case No. 16FE014627. No issues are raised as to that conviction or sentence.

[10] This case was fully briefed and assigned to this panel on August 15, 2022.

determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319.) In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)' " (*People v. Dalton* (2019) 7 Cal.5th 166, 243-244.) Substantial evidence includes circumstantial evidence and the related reasonable inferences. (*People v. Holt* (1997) 15 Cal.4th 619, 669, citing *People v. Raley* (1992) 2 Cal.4th 870, 891.) That the evidence might lead to a different verdict does not warrant a conclusion that the evidence supporting the verdict is insubstantial. (*Holt*, at p. 669.) This standard is the same under federal or California law. (*People v. Hernandez* (1988) 47 Cal.3d 315, 345-346.)

## A. Attempted Murder

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Intent to unlawfully kill and express malice are, in essence, "one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Thus, to be guilty of attempted murder, a defendant must harbor express malice toward the named victim— a showing the assailant either desires the result or knows to a substantial certainty the result will occur. (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) There is rarely direct evidence of intent, but it may be inferred from all of the circumstances underlying the intent, including the defendant's actions. (*People v. Smith* (2005) 37 Cal.4th 733, 741.) While reasonable minds may differ on the resolution of whether the defendant had the intent to kill, the reviewing court's "sole function is to determine if *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley* (1991) 1 Cal.App.4th 938, 946.)

The doctrine of transferred intent does not apply to attempted murder. (*People v. Smith, supra*, 37 Cal.4th at pp. 739-740.) "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*People v. Bland* (2002) 28 Cal.4th 313, 328.) Whether the defendant acted with specific intent to kill "must be judged separately as to each alleged victim." (*Id.* at p. 331.) Accordingly, the prosecution had to prove that defendants purposefully shot at I.P. and Angelina, with express malice as to each person, in order to establish the requisite state of mind for their respective convictions for attempted murder.

### 1. Defendant Taylor

Taylor claims there was no direct evidence and very little circumstantial evidence she knew I.P. was in the car, and even less evidence to support an inference that Taylor had any intent to harm I.P. Taylor asserts the prosecutor's closing argument effectively conceded there was insufficient evidence to support the theory that Taylor specifically intended to kill I.P. when she instead argued Taylor inadvertently shot I.P. when she missed her intended target: Angelina. Without alleging prosecutorial misconduct, Taylor essentially argues that the prosecutor put forth a "kill zone" theory of liability, without the corresponding instructions on that theory.[11] Naturally, the People disagree.

### a. Additional Background

The prosecutor argued during closing argument:

---

[11] Taylor also argues that even if the prosecution had requested kill zone instructions, the evidence would not support such a request. We need not address this argument, however, as requirements of ripeness " 'prevent[] courts from issuing purely advisory opinions, or considering a hypothetical state of facts in order to give general guidance rather than to resolve a specific legal dispute' [citation]." (*In re Joshua S.* (2007) 41 Cal.4th 261, 273.)

"So the first element is that [Taylor] took a direct but ineffective step towards killing [I.P.] . . . [¶] And the second is that the defendant intended to kill [I.P.] [¶] . . . [¶] . . . But when you're looking at the first element, did [Taylor] take a direct but ineffective step towards killing [I.P.]? The evidence . . . shows that she fired six times at the car with [I.P.] in it. That's a direct but ineffective step. Firing one time is a direct but ineffective step for killing somebody because a firearm is designed to kill. That's the purpose of a firearm. You don't shoot someone to hurt them. You don't shoot someone or shoot near someone to say hello. You don't control what impact that bullet has on a body once it leaves a gun. You shoot someone to kill them. And that's common sense.

"And the direct step that she took was shooting six times. And we know she got her twice. . . . [¶] . . . [¶] But we know from common sense, when you shoot at someone six times, again, you are not trying to hurt them, you're certainly not saying hello. Okay. That is just common sense. [¶] And we know that [Taylor] could see [I.P.] We know that. The window was down. . . . [¶] . . . [¶] She certainly knew [I.P.] was in the back of the car when she fired six times. She didn't care who she was shooting. She was intending to kill both of those people because she had no control over where those bullets were going."

During a break in the prosecutor's argument the parties discussed whether the prosecutor was relying on a kill zone theory of liability; the prosecutor affirmed she was not.

The prosecutor continued her closing argument:

"[L]ike we talked about earlier, when [Taylor] opened fire to that car, she intended to kill everyone in it. [¶] And we can look, and the law says that when you fire at a car, knowing that there's more than one person in it, your intent can go to all of them. It goes to all of the people in the car. [¶] Because like I said earlier, you can't pick and choose. When you unload a firearm into a car, you don't—once that bullet's gone and out of that gun, you don't get to pick and choose who it hits. [¶] This certainly isn't a case where

13

[Taylor] was saying, 'Don't worry, [I.P.], I'm not trying to kill you, I'm only trying to kill your mom,' right? She's shooting into the car, not caring. Because she just wants to kill whoever's in that car. Even though we know the real beef is with Angelina."

### b. Discussion

Contrary to Taylor's claim, there was sufficient evidence to support a conclusion that Taylor saw I.P. in the car, and thus harbored the specific intent to kill her as well as Angelina. Angelina opined that people in the white car must have seen I.P. because I.P. was looking out of the window before the shots were fired. There was ample evidence to support this inference. The white car drove along the passenger side of Angelina's car, where I.P. was sitting. Angelina saw Taylor lean over from the passenger side of the white car, over the reclined driver, to yell out of that driver side window at Angelina. Angelina's ability to see Taylor's actions of leaning over the driver strongly suggest that Taylor was close enough to Angelina's car such that she could have, and likely did, see I.P. I.P. testified she stuck her head out of the window and saw and heard Taylor's angry demand for Angelina to pull over. She saw Taylor clearly and long enough to be able to describe her hair and skin color, including the fact that she had red, pimple-like marks on her face. A reasonable inference from these facts is that Taylor saw I.P. prior to the shooting, and thus knew of I.P.'s presence in the car prior to firing the gun six times. (Cf. *People v. Booker* (2011) 51 Cal.4th 141, 178 [inference that the defendant was aware of the presence of a baby prior to setting fire to the apartment was reasonable where the defendant told the police that he had heard a baby, somewhere, crying that night and a playpen was next to the victim's bloodstained bed]; see also *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 691 [one shot could support a conviction on two counts of attempted murder because it was reasonable for the jury to infer, from testimony by one officer that she was crouched behind but above the other, and was visible to the defendant].)

Although Taylor argues there is insufficient evidence of her specific intent to kill, again, we disagree. Given the reasonable inference that Taylor saw I.P. prior to shooting,

14

and still fired six shots into the side of the car where I.P. was sitting, many of which entered through I.P.'s door hitting and shattering one of her bones, a trier of fact reasonably could have found that Taylor was substantially certain that I.P. would be killed when Taylor fired the weapon. That the bullets did not actually kill I.P., or hit Angelina, does not undermine the jury's finding regarding Taylor's intent as to I.P. That Taylor had no particular motive for shooting I.P. is not dispositive, as motive is not an element of the crime of attempted murder. (*People v. Houston, supra*, 54 Cal.4th at p. 1218.)

We also disagree with Taylor's argument that the prosecutor's initial closing argument effectively conceded an inability to prove specific intent to kill and asked the jury to disregard that element of the offense. The prosecutor specifically argued that the evidence demonstrated Taylor's efforts to target I.P. and Angelina with a specific intent to kill when Taylor chose a firearm as her weapon then fired six shots in the direction of I.P. (who was visible) and Angelina. The prosecutor argued, "This certainly isn't a case where [Taylor] was saying, 'Don't worry, [I.P.], I'm not trying to kill you, I'm only trying to kill your mom,' right? She's shooting into the car, not caring. Because she just wants to kill whoever's in that car. Even though we know the real beef is with Angelina." Contrary to Taylor's claim, this argument conveys to the jury the prosecution's theory that Taylor had specific intent to kill both I.P. and Angelina but would have been satisfied if either goal was accomplished. "The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of an intent to kill . . . .' [Citation]." (*People v. Chinchilla, supra*, 52 Cal.App.4th at p. 690; see also *People v. Houston, supra*, 54 Cal.4th at p. 1218.) We conclude the prosecutor urged the jury to find Taylor had specific intent to kill I.P.

More importantly, the trial court instructed the jury that specific intent to kill I.P. was required to find Taylor guilty of the attempted murder of I.P.; the jury was not

15

instructed on the kill zone theory under CALCRIM No. 600. CALCRIM No. 600, as instructed, states in part: "To prove that a defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt." We presume the jury followed these instructions. (See *People v. Edwards* (2013) 57 Cal.4th 658, 764 [presuming jury will follow instruction that statements of attorneys are not evidence]; *People v. Bryden* (1998) 63 Cal.App.4th 159, 184 ["Further, the court instructed the jury that questions and statements by the attorneys do not constitute evidence, and the jury is presumed to follow the court's instructions"].) Taylor has provided no basis to conclude otherwise.

In sum, there was sufficient evidence to support the verdict of attempted murder of I.P. and there is no reason to conclude the prosecutor's statements in her initial closing argument conceded otherwise.

  *2. Defendant Charles*

Charles argues the prosecution's evidence failed to connect him to the shooting. He argues there was: insufficient evidence that he was the driver when he lent his car to others; Angelina provided only a generalized description of the driver and repeatedly stated she did not see the driver's face; and no ballistic or forensic evidence supported the conclusion that he participated in any way. He contends that cell phone tower evidence is insufficient to connect him to the shooting because it only registered his approximate

16

locations within a five-mile radius, and no other independent evidence suggested he was present at the scene. He argues the prosecution's evidence was limited to speculative connections between Charles and the shooting based on the fact that he was Taylor's brother and the driver was identified as a black man. Charles further argues even if he was present, there was insufficient evidence of his guilt either as a direct perpetrator or under a theory of aiding and abetting.

The People do not dispute that Charles was never identified as the driver. Instead, the People argue the evidence, and the inferences drawn from it, support his convictions under an aider and abettor theory. We agree with the People.

An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted.) "[P]roof of an attempt by a direct perpetrator is sufficient for purposes of aiding and abetting liability. If a direct perpetrator is thwarted and guilty only of an attempt, an aider and abettor may still be guilty of aiding and abetting the attempt." (*People v. Perez* (2005) 35 Cal.4th 1219, 1226, italics omitted.) A defendant's presence at the scene of the crime, companionship, and conduct before and after the offense are factors which may be considered in making the determination of whether they aided and abetted the crimes. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.)

Here, virtually all of these factors are present. First, there is substantial evidence that Charles's car was used to commit the shooting. To law enforcement, Angelina consistently stated that the white car was a dirty, old "scraper" four-door white sedan with chipped paint by the grill—an Oldsmobile or Buick. Although the likely candidate was actually Charles's Lumina, any impeachment value in the discrepancy between the Chevrolet model Angelina identified and the model Charles owns is minor given the other factors connecting the car involved in the shooting to Charles. Specifically, Angelina said she recognized the car as belonging to Charles. She was familiar with the

17

car because she had been inside it with Cassiano. She knew the car involved in the shooting had a bench seat in the front, which was the same for the Lumina. The Lumina, a dirty, white, four-door sedan with a damaged front end, otherwise matched the description of the car involved in the shooting.

There was also substantial evidence that Charles was present and drove the car during the shooting. Angelina told her mother at the hospital that Charles and Taylor were responsible for the shooting, but said she was not going to tell the police out of fear of being labeled a "snitch."[12] She also texted her father that Charles was the driver. She told police the driver was a bigger, light-skinned black male with wavy hair and a fade haircut. Charles was approximately 6 feet 5 inches to 6 feet 6 inches tall. "[P]utting everything together," Angelina later told police that Charles was the driver. In addition, the cell phone tower evidence placed Charles's cell phone in the area before, during and after the shooting. Indeed, consistent with Angelina's claim that the white car followed her to the University of California, Davis medical facility, Charles's cell phone was detected by a cell phone tower near that medical facility by 7:49 p.m. Charles's cell phone continued to connect with cell towers on the path to Oroville, where Charles and his sister were found four days later.

Substantial evidence also supports the conclusion that Charles was not merely present for the shooting but aided and abetted Taylor in the commission of the offense. Angelina said the driver had his seat back and that Taylor leaned over him to yell at Angelina to pull over. The driver then "turned crazy" in order to get behind Angelina's car, after which shots were fired. Gunshot residue was found on the driver's and

---

[12] We have no power on appeal to reweigh the evidence or judge the credibility of witnesses. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) Thus, we do not accept Charles's invitation to consider whether inconsistencies in witness testimony, such as Felicia's admission that her statements given at the hospital do not mention the driver, as significant enough to undermine the testimony.

18

passenger's side headliner.  Although it was impossible to tell when that residue was left there, it is reasonable to infer that it was deposited there as Taylor leaned over Charles to fire the weapon at least six times out of his window.  The inference that Charles knew of the presence of the gun under those circumstances is inescapable, and Charles's participation in maneuvering the car to get close to Angelina's car helped Taylor facilitate the shooting.  The jury had sufficient evidence to conclude Charles shared Taylor's intent to kill Angelina.  Indeed, Charles then fled to Oroville, from which action the jury was allowed to infer his consciousness of guilt.  Following his arrest, he gave multiple inconsistent statements to the police.  All of this amounts to sufficient evidence for the jury to have found Charles guilty of the crimes of attempted murder and shooting at an occupied vehicle.

## II

### Testimony Regarding Text Message

Charles argues the trial court prejudicially erred in allowing Detective Madriago to testify to the contents of a text message she saw, sent from Angelina to her father, in which Angelina said that Charles drove the car during the shooting.  Because this evidence was double hearsay and was admitted without the proper foundation, he argues, the trial court committed error under state and federal law.  We disagree.

#### A.  Additional Background

Prior to trial, defense counsel moved to dismiss the case pursuant to *California v. Trombetta* (1984) 467 U.S. 479, 488-489, in light of missing or destroyed evidence: proof of text messages, about which Detective Madriago testified at the preliminary hearing.  Although the motion referenced a particular text from Angelina to Detective Madriago, at the hearing on the motion, the parties discussed the fact that multiple text messages formerly in Detective Madriago's possession were missing.  The prosecutor represented that Detective Madriago transferred to a new unit, received a new phone, and could no longer locate the screenshots of the text messages.  The prosecutor assured the

19

court and defense counsel she would continue the search for the communications, but noted that Detective Madriago would be available to testify as to the contents of those messages. The trial court denied the motion to dismiss, finding there was no bad faith on the part of the prosecution.

During trial, the prosecutor asked Detective Madriago whether she saw text messages sent by Angelina to a family member. Defense counsel objected on grounds of both hearsay and lack of foundation. The court commented: "[I]t would be good if we knew to whom those were sent. I mean, I think it's being offered for rebuttal for -- her testimony was impeached so many times that I think any reference by her to who the driver was, to whoever it was, would be inadmissible, but it would be helpful to find out who those persons were."

Detective Madriago then testified that the text message she viewed was sent by Angelina to her father, and in the text message Angelina identified Charles as the driver. Next, Detective Madriago testified that she confirmed that the message came from Angelina's phone. In fact, Detective Madriago had Angelina's father open the contact on his phone and show her that it was associated with Angelina's phone number. Detective Madriago then testified that Angelina had identified "Dion" as the driver.

*B. Analysis*

On appeal, Charles challenges the admissibility of the text message on the same two grounds as he did at trial: lack of foundation and hearsay. We first address Charles's hearsay claim, in which he contends the content of the text message should have been excluded as inadmissible double hearsay. He maintains Detective Madriago's testimony about the text message did not meet any exception to the hearsay rule and carried no indicia of reliability. The People disagree, arguing the statement qualified as a prior inconsistent statement and was properly admitted. We agree with the People.

Initially, we note that contrary to Charles's claim, Detective Madriago's testimony about the content of the text message is not double hearsay—she did not relay what

Angelina's father said Angelina wrote. Instead, Detective Madriago viewed the message herself, as if Angelina had texted the message to her. Thus, we need only be concerned with one layer of hearsay. (Cf. *People v. Anderson* (2018) 5 Cal.5th 372, 403 [explaining double hearsay appears when a witness testifies to what another person said the defendant told that other person].)

We review evidentiary rulings for an abuse of discretion, and a trial court's decision to admit or exclude evidence will not be disturbed on appeal unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Thomas* (2011) 51 Cal.4th 449, 485.)

Hearsay is defined as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) As relevant here, one such exception to the hearsay rule is commonly referred to as the prior inconsistent statement exception. (Evid. Code, § 1235.)

Evidence Code section 1235 authorizes the admission of a witness's prior inconsistent statement into evidence when the statement is inconsistent with his or her testimony at the hearing and is in compliance with Evidence Code section 770. (Evid. Code, § 1235.) Under Evidence Code section 770, an inconsistent statement is not admissible unless the witness either testified and was given "an opportunity to explain or to deny the statement" or "has not been excused from giving further testimony in the action." (Evid. Code, § 770, subds. (a) & (b).) We conclude these requirements were met in the instant case.

Angelina's text message in which she identified Charles as the driver was inconsistent with her testimony that she never saw or identified the driver; she only

21

logically assumed Charles was the driver.[13]  In addition, as the People note, Evidence Code section 770 was satisfied.  This section expressly provides two alternative methods for presenting a prior inconsistent statement:  "[E]ither that the declarant be provided an opportunity to explain or deny the statement or that he [or she] be kept available for further testimony."  (*People v. Freeman* (1971) 20 Cal.App.3d 488, 495.)  Here, the prosecutor kept Angelina available for recall.  The trial court specifically informed Angelina that, while she apparently finished her testimony, she was not released from the subpoena, was subject to recall, and police would search for her if she did not respond to a subsequent call for additional testimony.  Thus, the text message statement was properly admitted as a prior inconsistent statement and the jury was left to choose which version to believe or reject both versions altogether.

Charles finally argues the testimony was not sufficiently trustworthy to be admissible.  Trustworthiness is not an element of the hearsay exception for prior inconsistent statements (Evid. Code, § 1235) but, like most types of evidence, a matter for the jury to weigh.  (*People v. Anderson* (2018) 5 Cal.5th 372, 404.)  Indeed, permitting inconsistent statements to be used as substantive evidence, so long as the requirements of Evidence Code section 770 were satisfied, largely eliminates " 'the dangers against which the hearsay rule is designed to protect' " because the declarant may be questioned about the statement, the trier of fact can observe the demeanor of the declarant, and the proponent of the inconsistent statement is protected against the " 'turncoat' " witness who changes his story on the stand.  (*People v. Brown* (1995) 35 Cal.App.4th 1585, 1596-1597.)  Thus, we find Charles's argument that the text message lacked trustworthiness fails.

---

[13]  Indeed, the trial court essentially acknowledged the inconsistency when it pointed out the frequency of Angelina's impeachment.

We next address Charles's contention that the prosecution failed to introduce a sufficient foundation to authenticate the text message. He complains the prosecution did not present the actual text or even a screenshot of the text, but rather introduced the content of the text through Detective Madriago's testimony. He claims that in admitting this testimony despite troubling concerns about authenticity, the trial court impinged on his right to due process and a fair trial. The People respond the trial court implicitly found the message was authenticated sufficiently to admit the testimony and allow the jury to consider its weight.

Evidence Code section 1521 provides, in part: "The content of a writing may be proved by otherwise admissible secondary evidence." (§ 1521, subd. (a).) "Once the proponent of the evidence establishes its authenticity, section 1521 requires exclusion of secondary evidence only if the court determines (1) '[a] genuine dispute exists concerning material terms of the writing and justice requires the exclusion' or (2) '[a]dmission of the secondary evidence would be unfair.' " (*People v. Skiles* (2011) 51 Cal.4th 1178, 1188, quoting Evid. Code, § 1521, subd. (a)(1) & (2).) Oral testimony may be admissible to prove the content of a writing if certain conditions are met, including, as relevant here, "the proponent does not have possession or control of a copy of the writing and the original is lost or has been destroyed without fraudulent intent on the part of the proponent of the evidence." (Evid. Code, § 1523, subd. (b).; see *Meeks v. AutoZone, Inc.* (2018) 24 Cal.App.5th 855, 863.)

While the scope of the trial court's discretion is exceedingly broad, the scope of the foundational question presented is quite narrow. "The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity

23

goes to the document's weight as evidence, not its admissibility.' " (*People v. Goldsmith* (2014) 59 Cal.4th 258, 267.)

This secondary evidence rule does not "excuse[] compliance with Section 1401 (authentication)." (Evid. Code, § 1521, subd. (c).) "[T]o be 'otherwise admissible,' secondary evidence must be authenticated." (*People v. Skiles, supra*, 51 Cal.4th at p. 1187; see Evid. Code, § 1401, subd. (b) ["Authentication of a writing is required before secondary evidence of its content may be received in evidence"].) "[T]he proponent's burden of producing evidence to show authenticity ([Evid. Code, ]§ 1400) is met 'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]' [Citation.] The author's testimony is not required to authenticate a document ([Evid. Code, ]§ 1411); instead, its authenticity may be established by the contents of the writing ([Evid. Code, ]§ 1421) or by other means ([Evid. Code, ]§ 1410 [no restriction on 'the means by which a writing may be authenticated'])." (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) "Circumstantial evidence, content and location are all valid means of authentication." (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.) The fact conflicting inferences can be drawn regarding authenticity does not make evidence inadmissible. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) After the trial court makes a preliminary finding of authenticity by sufficient evidence, the weight afforded to the document becomes a question of fact for the jury. (*Valdez*, at pp. 1434-1435.)

Charles argues the evidence does not meet admissibility requirements under the Evidence Code because Detective Madriago did not indicate that a record of the specific incriminating text message had been lost, destroyed, out of her possession or control or was otherwise unavailable. (See Evid. Code, § 1523.) The People do not respond to this

24

point.[14] Neither party address the relevancy of the pretrial discussion regarding the disappearance of screenshots of text messages where the trial court recognized documents were lost through no bad faith on the part of the prosecutor and was satisfied by the prosecutor's assurance that the detective would be available for cross-examination. As multiple text messages from the same detective were the subject of that pretrial discussion, it appears this particular text message was included in that discussion and resolution. Even if it was not specifically included, Taylor does not elaborate how or why the foundation found satisfactory for some of the missing text messages would not also apply to this specific text message.

There was sufficient evidence to support a preliminary finding of authenticity. Detective Madriago testified that she visually confirmed the text message she saw from Angelina to her father was sent from Angelina's phone number. Angelina's father showed Detective Madriago that the text message he received from Angelina was, in fact, associated with Angelina's phone number. Detective Madriago also described the content of the text. Because the prosecution presented adequate evidence to support a finding the text messages were what they purported to be—a communication from Angelina—we conclude the trial court did not abuse its discretion in admitting the evidence for the jury to ultimately decide on its weight. (See *People v. Perez* (2017) 18 Cal.App.5th 598, 620-622.)

Because we conclude there was no error in admitting the testimony, we need not address the parties' harmless error analysis.

---

[14] The parties leave this court to scour the record in search of the basis for the evidentiary ruling. That is not our role. (See *Neurelis, Inc. v. Aquestive Therapeutics, Inc.* (2021) 71 Cal.App.5th 769, 797.)

25

*III*

*Jury Instructions*

Charles asserts that the trial court "failed to clear up the instructional confusion expressed by the jury and thus violated the trial court's duty under section 1138." As a result, Charles contends, the jury had no meaningful understanding of how to assess whether the evidence proved that he had the requisite knowledge and intent for the crimes charged or simply assisted in Taylor's escape and detection prevention. We disagree.

*A. Additional Background*

The jury was instructed on the general principles of aiding and abetting through CALCRIM Nos. 400 and 401.

During deliberations, the jury asked the following: "401. # 2 Aiding & Abetting [¶] (1) The defendant knew that the perpetrator intended to commit the crime; Is there a timeframe, ex. before, during, after? What is the definition of 'intended'? [¶] (2) Do we need to agree to all 4 points to find guilty?"

Charles's counsel requested the court respond to this question by informing the jury it must unanimously agree that all four parts have been proven beyond a reasonable doubt. She also requested the court give CALCRIM No. 3500 regarding unanimity regarding the jury's decision on intent; i.e. "The jury must unanimously agree that the intent required for aiding and abetting occurred before or during the crime committed by the perpetrator. The jury must all agree as to which act constituted the intent." The prosecutor disagreed that unanimity was required.

The court responded to the jury's questions as follows: "The aiding and abetting has to occur before or during the commission of the crime by the perpetrator. [¶] 'Intended' is one of those words that is not specifically defined in the instructions. Accordingly, the everyday, ordinary meaning should be used. (See CALCRIM 200.) [¶] Yes, the District Attorney has to prove all four elements of aiding and abetting beyond a reasonable doubt."

26

Thereafter, the jury sent a subsequent question: "401. On the aiding & abetting qualifications, the 2nd part stating 'Defendant knew perp. intended to commit the crime.' Does this refer to prior to the crime being committed? Does the 3rd part reflect the 'intention' aspect of the 2nd part listed above?"

The jury also sent another question: "Can you show intent during a crime or does it need to be before? [¶] In relation to 401 #2."

Charles's counsel requested the following response to these questions: "The crime of attempted murder is a specific intent crime. As a result, the prosecution must prove that an aider and abettor shared the perpetrator's specific intent and that he knew the full extent of the perpetrator's criminal purpose and gave aid or encouragement with the intent of facilitating the perpetrator's commission of the crime. The jury must find that an aider and abettor shared the perpetrator's specific intent. In this case, that would mean that the aider and abettor shared the perpetrator's specific intent to kill. [¶] If the aider and abettor formed the intent to facilitate after the shooting, then the aider and abettor can only be guilty as an accessory after the fact. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

The prosecutor objected to defense counsel's proposed response, stating that it provided the jury more than it had asked and the intent portion related only to the crime of attempted murder and not the offense of discharging a firearm at an occupied vehicle under section 246.

Defense counsel responded that it was clear the jury was struggling with the issue of intent as it applies to aider and abettor liability and the charged crimes include attempted murder, which is a specific intent crime, as well as the section 246 general intent offense. Defense counsel argued that her proposal provided an accurate statement

27

of the law and answered the jury's question, and that it would be error for the court to fail to provide the jury a correct statement of the law or fail to answer its question.

The court ultimately responded to the jury's questions: "In response to Question No. 3: [¶] If you are asking whether the aider and abettor must know of the perpetrator's intent to commit a crime *before* it is committed, the answer is no. Knowledge that the perpetrator intends to commit the crime may be acquired during the commission of the crime. The third of [*sic*] element of CALCRIM 401 states that, with knowledge of the perpetrator's intentions, defendant formed the intent to aid and abet the perpetrator in the commission of the crime before or during its commission.

"In response to Question No. 4: [¶] The knowledge element as set forth in the second element of CALCRIM 401 can be formed during the commission of the crime."

Thereafter, the jury asked for a transcript of the closing statements of both the prosecutor and Charles's counsel. The court denied that request on the basis that closing arguments are not evidence.

*B. Analysis*

When a jury asks a question after retiring for deliberation, section 1138 imposes upon the trial court a duty to provide the jury with information the jury desires on points of law. (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.) Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations, if any, are sufficient to satisfy the jury's request for information. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1213.) Indeed, comments diverging from the standard instructions are often risky. (E.g., *People v. Lee* (1979) 92 Cal.App.3d 707, 716; *People v. Beardslee* (1991) 53 Cal.3d 68, 97.) Because Charles does not contend that the original instructions were not full and complete, the trial court's decision whether to provide further instruction in response to a jury question is reviewed for abuse of discretion, and "the legal accuracy of any supplemental

28

instructions provided" is reviewed de novo. (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887; *id.* at p. 887, fn. 4; *Eid*, at p. 882.)

Charles complains that the trial court failed to clear up the jury's confusion when it was clear at least one juror was "struggling with the elements of knowledge and intent in the aider and abettor instructions." He faults the trial court's direction to use the everyday meaning of intent, arguing it provided "no help." When the jury submitted two more questions regarding the timing of the aider and abettor's knowledge and the relationship between knowledge and the intent to aid, Charles argues, the trial court again failed to "clear up the confusion." We note that Charles does not challenge the legal accuracy of the trial court's responses to the questions. Rather, his complaint is that they did not go far enough—like those responses suggested by defense counsel.

We find no error. The trial court answered the jury's question regarding the definition of intent. The word intent is not a technical word; it is a common word which simply means design or purpose. (See Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 651, col. 1.) Indeed, there is nothing in the Penal Code that suggests that the Legislature contemplated a scientific, technical or particular mental limitation in the use of the word intent. Because the term intent is commonly understood, it was within the court's sound discretion to provide this particular answer in response to the jury's question. (See *People v. Waidla* (2000) 22 Cal.4th 690, 745-746; see also *People v. Anderson* (1966) 64 Cal.2d. 633, 639 ["when terms have no technical meaning peculiar to the law, but are commonly understood by those familiar with the English language, instructions as to their meaning are not required"].)

Additionally, the jury's questions sought clarification on the timing of Charles's knowledge of Taylor's intent to commit the charged offenses necessary for aiding and abetting liability purposes. Consistent with the elements of aiding and abetting, the trial court instructed the jury that knowledge had to be acquired either before or during the commission of the crime, which the trial court instructed through both CALCRIM

29

No. 401 and in its responses to the jury's questions. This was legally correct. Charles argues that a more complete answer was required in order to tell the jury that mere presence coupled with knowledge, or an intent to assist after the fact were insufficient to prove him culpable as an aider and abettor. But as the prosecutor noted, such responses would have gone beyond the scope of the questions asked; the jury never indicated these latter concerns were sources of confusion. Nor did the court plant the seed for such confusion. In fact, CALCRIM No. 401 already informed the jury that mere presence was insufficient to establish liability.

Accordingly, we find no error in the trial court's responses to the jury's questions.

*IV*

*Cumulative Error*

Charles contends that the judgment should be reversed based on the cumulative prejudice of the court's errors. However, we have determined that there was no error, so no prejudice could accumulate. (*People v. Vargas* (2020) 9 Cal.5th 793, 839.)

*V*

*Sentencing*

Charles and Taylor raise a host of sentencing concerns. Charles first claims that sentences imposed in two cases for which he was on probation must be vacated in light of new legislation. We disagree that new legislation impacts the trial court's ability to sentence Charles in his two cases in which he violated probation. However, we agree with both Charles and Taylor that new legislation calls into doubt the viability of their respective upper term sentences, requiring us to remand the matter for a new sentencing hearing. In light of this conclusion, we need not address any additional sentencing concerns; Charles and Taylor may raise them at the new hearing.

A. *Violation of Probation*

Charles claims that Assembly Bill Number No. 1950 (2019-2020 Reg. Sess.), effective January 1, 2021, requires this court to vacate his sentences in Sacramento

30

County Superior Court case Nos. 13F07333 and 14F02499. He claims that because he was sentenced in 2020 on these cases and his cases are not yet final, we are required to apply Assembly Bill No. 1950 retroactively to shorten his probation term from five years, to two, thereby retroactively depriving the trial court of jurisdiction to revoke his probation after passage of the two-year mark and rendering the revocation and termination of his probation invalid. The People agree that Assembly Bill No. 1950 applies retroactively to any case not final as of the effective date, but disagree that the ameliorative benefits of Assembly Bill No. 1950 apply to this case. The People contend Charles's probation was summarily revoked well before Assembly Bill No. 1950 came into effect and the new legislation does not operate to retroactively invalidate any revocation or tolling procedures under related statutes. We agree with the People.

1. *Additional Background*

In Sacramento County Superior Court case No. 13F07333, the prosecution charged Charles with fleeing or attempting to elude a peace officer (Veh. Code, § 2800.2, subd. (a)). On January 14, 2014, Charles pleaded no contest to the charge. On January 21, 2014, the court suspended the imposition of judgment and sentence and placed Charles on probation for five years. On August 1, 2016, the district attorney filed a petition alleging a violation of Charles's probation. On August 18, 2016, the court revoked Charles's probation. On September 25, 2020, the court found Charles in violation of probation and sentenced him to a two-year term to run concurrently with the sentence imposed in Sacramento County Superior Court case No. 16FE014627.

In Sacramento County Superior Court case No. 14F02499, the prosecution charged Charles with the following offenses: in count one, unauthorized use of personal identifying information of another (§ 530.5, subd. (a)); in counts two and three, commercial burglary (§ 459); and in counts four through seven, obtaining personal identifying information with intent to defraud (§ 530.5, subd. (c)(2)). On June 5, 2014, Charles pleaded no contest to one count of burglary (§ 459) and the court sentenced

31

Charles to 180 days in jail and placed him on probation for five years. On August 1, 2016, the district attorney filed a petition alleging a violation of Charles's probation. On August 18, 2016, the court revoked Charles's probation. On September 25, 2020, the court found Charles in violation of probation and sentenced him to a two-year term to run concurrently with the sentence imposed in Sacramento County Superior Court case No. 16FE014627.

*2. Analysis*

Effective January 1, 2021, Assembly Bill No. 1950 amended section 1203.1, subdivision (a) to limit the probation term for felony offenses to two years, except in circumstances not present here. (Stats. 2020, ch. 328, § 2; *People v. Lord* (2021) 64 Cal.App.5th 241, 245.)

Generally, "where the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed," so long as the amended statute takes effect before the judgment of conviction is final. (*In re Estrada* (1965) 63 Cal.2d 740, 748.) "This rule rests on an inference that when the Legislature has reduced the punishment for an offense, it has determined the 'former penalty was too severe' [citation] and therefore 'must have intended that the new statute imposing the new lighter penalty . . . should apply to every case to which it constitutionally could apply' [citation]." (*People v. DeHoyos* (2018) 4 Cal.5th 594, 600.)

We review de novo questions of statutory construction. (*People v. Tran* (2015) 61 Cal.4th 1160, 1166.) "Statutory construction begins with the plain, commonsense meaning of the words in the statute, ' "because it is generally the most reliable indicator of legislative intent and purpose." ' [Citation.] 'When the language of a statute is clear, we need go no further.' " (*People v. Manzo* (2012) 53 Cal.4th 880, 885.)

We conclude (as have all other appellate courts so far) that Assembly Bill No. 1950 "applies retroactively to defendants who were serving a term of probation when

32

the legislation became effective on January 1, 2021; in such cases, the courts have acted to reduce the length of their probation terms." (*People v. Faial* (2022) 75 Cal.App.5th 738, 743, review granted May 18, 2022, S273840, citing e.g., *People v. Greeley* (2021) 70 Cal.App.5th 609, 627; *People v. Czirban* (2021) 67 Cal.App.5th 1073, 1095; *People v. Schulz* (2021) 66 Cal.App.5th 887, 894-895; *People v. Lord* (2021) 64 Cal.App.5th 241, 244-246; *People v. Sims* (2021) 59 Cal.App.5th 943, 964; *People v. Quinn* (2021) 59 Cal.App.5th 874, 881-885.) This is largely because Assembly Bill No. 1950 is an ameliorative change that decreases punishment. "With certain exceptions, the new law limits the term of probation for a felony conviction to two years. While probation is not considered punishment in the same way incarceration is, it is clear probation is 'a "form of punishment." ' " (*Lord*, at p. 245.) In addition, there is no saving clause in Assembly Bill No. 1950 "or other indication it should be applied prospectively only" (*Lord*, at p. 245), and the legislative history demonstrates concern that current and future probationers face unwarranted risks of incarceration due to the lengths of their probation terms (*People v. Sims, supra*, 59 Cal.App.5th at p. 961).

We, however, are not persuaded that Assembly Bill No. 1950 invalidates a trial court's revocation and termination of a defendant's probation where, as here, such actions were properly taken before Assembly Bill No. 1950's effective date. (See *People v. Faial, supra*, 75 Cal.App.5th at p. 743, review granted [cases cited therein];[15] *Kuhnel v.*

---

[15] In granting review in *People v. Faial*, our high court noted that "[p]ending review, the opinion of the Court of Appeal, which is currently published at 75 Cal.App.5th 738, may be cited, not only for its persuasive value, but also for the limited purpose of establishing the existence of a conflict in authority that would in turn allow trial courts to exercise discretion under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456, to choose between sides of any such conflict. (See Standing Order Exercising Authority Under California Rules of Court, Rule 8.1115(e)(3), Upon Grant of Review or Transfer of a Matter with an Underlying Published Court of Appeal Opinion, Administrative Order 2021-04-21; Cal. Rules of Court, rule 8.1115(e)(3) and corresponding Comment, par. 2.)" (*People v. Faial, supra*, 75 Cal App.5th 738, review granted.)

*Appellate Division of Superior Court* (2022) 75 Cal.App.5th 726, 732, review granted June 1, 2022, S274000; but see *People v. Canedos* (2022) 77 Cal.App.5th 469, review granted June 29, 2022, S274244.)

The People argue the retroactivity of Assembly Bill No. 1950 does not help Charles because the trial court summarily revoked Charles's probation before Assembly Bill No. 1950 became effective, and the summary revocation tolled Charles's probation under section 1203.2. Section 1203.2 provides that if there is "probable cause to believe that the supervised person is violating any term or condition of the person's supervision," the person may be rearrested and "the court may revoke and terminate the supervision of the person if the interests of justice so require . . . ." (§ 1203.2, subd. (a).) Revocation under this provision, "summary or otherwise, shall serve to toll the running of the period of supervision." (*Ibid.*)

The California Supreme Court addressed the nature of the tolling provision in *People v. Leiva* (2013) 56 Cal.4th 498. It found the Legislature intended the tolling provision "to preserve the trial court's authority to hold a formal probation violation hearing at a time after probation would have expired with regard to a violation that was alleged to have occurred during the probationary period." (*Id.* at pp. 514-515, italics omitted.) The court explained that formal proceedings are not " 'to revoke probation, as the revocation has occurred as a matter of law; rather, the purpose is to give the defendant an opportunity to require the prosecution to prove the alleged violation occurred and justifies revocation.' [Citation.] . . . [Citation.] . . . Accordingly, a trial court can find a violation of probation and then reinstate and extend the terms of probation 'if, and only if, probation is reinstated based upon a violation that occurred during the unextended period of probation.' [Citation.]" (*Id.* at pp. 515-516, fn. & italics omitted.)

Charles counters that Assembly Bill No. 1950 retroactively rendered his third year of probation a nullity, and thus a revocation of probation could not have occurred during that third year. (See *People v. Canedos, supra*, 77 Cal.App.5th at p. 480, review granted

34

[in cases where the defendant's misconduct occurred outside of the maximum probation term under Assem. Bill No. 1950, the violation did not " 'occur[] during the probationary period' " as amended by the new statute and there is no justification for tolling the probation term under § 1203.2, subd. (a)].)  The People urge that such an argument goes beyond the ameliorative benefit of Assembly Bill No. 1950 and would essentially create a legal fiction that no violation occurred.  We agree with the People that the amended statute does not include any terms purporting to modify a trial court's authority to revoke and terminate probation due to a defendant's violation of probation terms or conditions.  Nor did Assembly Bill No. 1950 undertake to amend section 1203.2 or section 1203.3— the statutes that confer and address such authority.  (*People v. Faial, supra*, 75 Cal.App.5th at p. 744, review granted.)

In 2016, Charles was in his third year of probation and Assembly Bill No. 1950 was not yet in effect.  Charles's probation had not expired under then-existing law when the prosecutor alleged Charles violated the terms of his probation.  The trial court had jurisdiction to summarily revoke his probation, which it did in August 2016.  This tolled Charles's probation under section 1203.2.  Charles's status on probation was essentially frozen for the purpose of later prosecution for the alleged violation.  (*People v. Leiva, supra*, 56 Cal.4th at p. 515.)

Assembly Bill No. 1950 did not eliminate the trial court's authority to revoke Charles's probation, given that the violation and revocation occurred when Charles was actually on probation.  Assembly Bill No. 1950 did not modify sections 1203.2 or 1203.3, the provisions dealing with revocation of probation and tolling.  "Had the Legislature intended to overturn pre-2021 revocation and termination orders that were based on violations committed while defendants were validly on probation, with the effect of upending their properly executed sentences, we may assume the Legislature could have demonstrated that intent through statutory language and would have at least mentioned the matter in the various legislative analyses of the bill.  It did not." (*People v. Faial,*

35

*supra*, 75 Cal.App.5th at p. 745, review granted; cf. *People v. Buycks* (2018) 5 Cal.5th 857, 892 [Prop. 47 retroactively reduced a felony drug conviction to a misdemeanor, but did not retroactively undo the defendant's felony conviction for his failure to appear on that original felony drug charge].)  The fact that the trial court formally terminated probation in 2020 and his appeal is pending after the effective date of Assembly Bill No. 1950, does not change our conclusion.  At all times while Charles's probation was tolled, the trial court retained the authority to determine whether there had been a violation during probation.  (*People v. Leiva, supra*, 56 Cal.4th at p. 515.)

The legislative history of Assembly Bill No. 1950 indicates the Legislature sought to limit the risk of future violations (*People v. Sims, supra*, 59 Cal.App.5th at p. 961) but not ignore violations and revocations that occurred during probationary periods prior to Assembly Bill No. 1950 taking effect.  (See *People v. Faial, supra*, 75 Cal.App.5th at p. 747, review granted.)  We conclude Assembly Bill No. 1950 does not retroactively invalidate the trial court's jurisdiction to revoke Charles's grants of probation such that his sentences on those cases must be vacated.

### B.  Section 1170

Charles and Taylor argue they are entitled to retroactive application of the relatively recent amendments to section 1170.  They argue factors in aggravation were improperly considered when those factors were not proved beyond a reasonable doubt, as the amended statute requires.  On the other hand, Taylor argues that her youthfulness was not considered to the degree required by the amended statute.  As Charles was also a youthful offender, this argument applies equally to him.  As to Charles, the People do not respond to these claims.  As to Taylor, the People agree that a new sentencing hearing is warranted in light of amendments to section 1170.

### 1.  Additional Background

At sentencing, Charles's defense counsel argued that he was only 23 years old at the time of the offense and was deserving of a mitigated sentence.

In sentencing Charles, the trial court stated, "the probation [report] laid out some aggravating facts, and I am agreeing with all of them, and I think that justifie[s] the sentence, so here is what the Court is going to do. Principal term will be Count Two. Sentence in that case is upper term of nine years. They'll be consecutive one year added for the arming enhancement under 12022(a)(1). Total in Count Two will be 10 years. [¶] Count Three, that's a 246. It will be one-third the middle. That will be one year and eight months, and that will be consecutive."

As to Taylor, the probation department recommended a sentence of an indeterminate term of 25 years to life consecutive to the determinate term of 29 years four months. Instead, the trial court sentenced Taylor to: the upper term of nine years on count two (as the principal term) (§§ 664/187, subd. (a)), two years four months (one-third the middle term) on count one (§§ 664/187, subd. (a)), and 25 years to life for the firearm enhancement associated with count one (§ 12022.53 subd. (d)). The court imposed but stayed a three-year term on count three. (§ 246.) The court struck the punishment for the firearm enhancement associated with count two (§§ 1385, 12022.53, subd. (b)), but denied Taylor's request to strike the firearm enhancement under section 12022.53, subdivision (d) associated with count one. Taylor's sentence constituted a total indeterminate term of 25 years to life and a consecutive term of 11 years four months. In sentencing Taylor, the trial court agreed with "the aggravating facts set forth on page five [of the probation report] on Rule 4.421."[16]

---

[16] The probation report lists the following factors in aggravation: the crime involved great violence, great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)); the manner in which the crime was carried out indicates planning (Cal. Rules of Court, rule 4.421(a)(8)); and the defendant has engaged in violent conduct which indicates a serious danger to society (Cal. Rules of Court, rule 4.421(b)(1)).

The court also acknowledged that Taylor was 21 years old at the time of the offense and, while not a juvenile, she was still "pretty young." The court continued, "[b]ut I believe overall that the nature of this crime was -- it will [*sic*] was a pitiless crime. Like I said, I know that Ms. Taylor has no record actually previously. It's one thing I really have had to think about very very -- for a long time and decide whether or not somebody who is suffering their first criminal conviction deserves a life sentence, but I think given the nature of the crime committed in this case and how it was done, firing a weapon into a vehicle multiple times and with a couple people in it, striking a young child. I think the aggravating facts are such that in this case a life sentence is, in fact, justified." When defense counsel argued that a life sentence constituted cruel and unusual punishment for a youthful offender like Taylor, the court initially responded that it understood the argument but that the aggravating factors justified a life sentence in this case. The court then stated, "I understand the argument being made by counsel, and I believe that it's probably right. That is a good possibility that in the not so distant future the sentencing laws will be revisited if not by the Court, maybe by the Legislature, and we may be back dealing with this, but I cannot impose a sentence right now anticipating something that may or may not happen in the future, so that motion [to strike the firearm enhancement] is denied." The court further stated that under the circumstances, a sentence of 25 years to life was "sufficient" and that adding another 29 years as recommended by the probation department, rather than the 11 years the court imposed, "just strikes me as being excessive . . . pretty close to violating the Eighth Amendment cruel and unusual punishment."

2. *Analysis*

While defendants' appeals were pending, section 1170 was amended by Senate Bill No. 567 (2021-2022 Reg. Sess.; Stats. 2021, ch. 731, § 1.3.) As amended, section 1170, subdivision (b) permits imposition of an upper term sentence "only when there are circumstances in aggravation of the crime that justify" the upper term and only if "the

38

facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  (§ 1170, subd. (b)(3).)  Additionally, as relevant here, section 1170, subdivision (b)(6) provides:  "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [and] that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:  [¶]  (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.  [¶]  (B) The person is a youth, or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense" and the defendant's youth "was a contributing factor in the commission of the offense."  (§ 1170, subd. (b)(6), effective Jan. 1, 2022; see also § 1016.7, subd. (b) ["A 'youth' for purposes of this section includes any person under 26 years of age on the date the offense was committed"].)[17]  We note section 1170, subdivision (b)(6)(B) does not require imposition of the lower term in every case in which the defendant was under age 26 at the time the crime was committed.  Rather, this provision establishes a presumption of the lower term if the defendant's youth was "a contributing factor" in his or her commission of the crime "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice . . . ."  (§ 1170, subd. (b)(6)(B).)

---

[17]  Section 1016.7 was added by Assembly Bill No. 124 (2021-2022 Reg. Sess.; Stats. 2021, ch. 695, § 4).

We agree with defendants that Senate Bill No. 567 " 'applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal.' " (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109; see also *In re Estrada, supra*, 63 Cal.2d at pp. 744-746.)  We also agree they are entitled to the benefits of the amendments.

In this case, Charles was under the age of 26, but he was sentenced without the benefit of this amendment and the record does not otherwise demonstrate that Charles's youth was considered in imposing the sentence.  Because a court that is unaware of the scope of its discretion necessarily abuses that discretion (*People v. Carmony* (2004) 33 Cal.4th 367, 378), the trial court's ruling is an abuse of discretion and the defendant is entitled to an opportunity to ask the court to exercise its discretion within the full range of possible sentences in mind.

Taylor was also under the age of 26 at the time of the offense.  Although the trial court considered Taylor's youthfulness while imposing her sentence, the trial court did so in determining whether a 25 year-to-life indeterminate term constituted cruel and unusual punishment.  The trial court did not consider Taylor's youthfulness in determining whether the lower term was appropriate under section 1170, subdivision (b)(6).  As with Charles, Taylor was sentenced without the benefit of this amendment, and the trial court's ruling was an abuse of discretion.  (See *People v. Carmony, supra*, 33 Cal.4th at p. 378 [because a court that is unaware of the scope of its discretion necessarily abuses that discretion].)

Accordingly, we agree the amended law under section 1170, subdivision (b) requires defendants' sentences be vacated.  We further conclude that remand to the trial court is necessary for it to apply the newly amended law, including all applicable provisions of section 1170 amended through Senate Bill No. 567, in the first instance and

decide whether defendants are entitled to the lower term.[18]  (See *People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.)

### C.  *Remaining Sentencing Issues*

Defendants raise additional arguments relating to sentencing.  Charles argues the trial court erred in imposing consecutive sentences under section 654.  Taylor argues that under *People v. Tirado* (2022) 12 Cal.5th 688, the law regarding the scope of a trial court's authority to strike a firearm enhancement has changed since her sentence was imposed and she is entitled to a new hearing in which the trial court considers its new-found authority under *Tirado*.  Both defendants argue they are entitled to a new sentencing hearing so that the trial court may exercise its discretion to determine the appropriate count on which to stay sentencing under section 654, as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.; Stats. 2021, ch. 441, § 1).

In light of our conclusion that defendants are entitled to a full sentencing hearing on remand, we need not address these issues.  On remand, defendants are not prohibited from making these arguments, as the trial court may revisit all of its sentencing choices in light of new legislation and caselaw.  (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1096.)

---

[18]  In light of this conclusion, we need not decide defendants' claim that the trial court based its decision to impose the upper term on underlying facts that were not proven in a statutorily permissible manner.

## DISPOSITION

Defendants' sentences are vacated and the case is remanded to the trial court for resentencing.  The judgments are otherwise affirmed.

                                                          /s/
                                             EARL, J.

We concur:

    /s/
ROBIE, Acting P. J.

    /s/
KRAUSE, J.